**ANR PIPELINE COMPANY, a
Delaware corporation,
Plaintiff,**

v.

**CONOCO, INC., a Delaware
corporation, Defendant.**

**No. G86–819.**

United States District Court,
W.D. Michigan, S.D.

Oct. 22, 1986.

Mika, Meyers, Beckett & Jones by John C. Jones, John M. DeVries, Grand Rapids, Mich., for plaintiff.

Ernst Altgelt, III, Russell A. Pitts of Miller, Canfield, Paddock & Stone, Grand Rapids, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

### Introduction

Plaintiff ANR Pipeline Corporation ("ANR") and Defendant Conoco, Inc. ("CONOCO") are both Delaware corporations authorized to do business in Michigan. ANR is engaged in the business of purchasing, transporting and selling natural gas to various gas distribution utilities in nine different states including Michigan. ANR maintains its headquarters and other offices in Michigan. Defendant CONOCO is a producer and marketer of natural gas and is one of ANR's major suppliers of natural gas.

On or about August 27, 1985, ANR filed its Verified Complaint in the Circuit Court for Mecosta County, Michigan, alleging that its performance of the take-or-pay and minimum monthly take obligations under seven (7) offshore and eight (8) onshore Gas Purchase contracts is excused as a result of *force majeure.* The state court issued a temporary restraining order ("TRO") enjoining CONOCO from initiating duplicate litigation in any other court and ordering CONOCO to appear and show cause on September 9, 1986 why the TRO should not be replaced with a preliminary injunction.

On September 8, 1986, Defendant CONOCO filed a petition for removal and on September 9, 1986 this Court extended the state court's TRO until September 17, 1986 and directed the parties to file briefs and supporting materials, and to appear before the Court September 17, 1986, today, to resolve two issues: 1) is this a proper case for removal; and 2) if this case is properly removed, should a preliminary injunction issue?

### Discussion

Defendant argues that this case was properly removed because this Court has

original jurisdiction over the seven Offshore Gas Purchase Contracts under 43 U.S.C. § 1349(b)(1) and pendent jurisdiction over the eight Onshore Gas Purchase Contracts. (If there is no original jurisdiction, the discussion of pendent jurisdiction, of course, becomes moot.)

1) Defendant argues that the express language of Section 1349(b)(1) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.* confers jurisdiction.

2) Defendant argues that even if jurisdiction is not conferred by OCSLA, plaintiff's well-pleaded complaint establishes that there is some substantial disputed question of federal law which is a necessary element of [at least] one of plaintiff's well-pleaded state claims.

I will address these arguments separately.

## I. *Jurisdiction Under OCSLA*

Where there is no diversity of citizenship between the parties as is the case here, whether removal is proper depends upon whether the case falls within the original federal question jurisdiction. See 28 U.S.C. § 1331. Under the well-pleaded complaint rule, a defendant may not remove such a case to federal court unless *plaintiff's* complaint—standing alone—establishes that the case arises under federal law within the meaning of § 1331. Where state-law causes of action are alleged, federal defenses that the plaintiff anticipates defendant may assert are simply irrelevant to the determination of whether there is federal question jurisdiction. Similarly, it is also irrelevant that sometime during the course of litigation a federal question may arise. *See Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California, et al.,* 463 U.S. 1, 10, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983).

To add to the jurisdictional confusion which often accompanies the application of the "well-pleaded complaint rule", the parties have also briefed and discussed the relevancy of the *Wycoff* dictum to this case. In *Public Service Commission v.*

*Wycoff Co.,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952), the Supreme Court noted that in a declaratory judgment action the realistic positions of the parties are often reversed. The Court noted that "where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the district court." *Id.* at 248, 73 S.Ct. at 242.

Both the well-pleaded complaint rule and the *Wycoff* dictum appear to be in play in this case. It is apparent that plaintiff ANR sought a declaratory judgment action in state court which would establish that events had occurred sufficient to trigger the *force majeure* clause in its contracts in order to stave off a breach of contract action which it anticipated that defendant CONOCO would soon be bringing.

Plaintiff has argued that under the *Wycoff* dictum and the "well-pleaded complaint" rule it is unnecessary to reach the issue of whether or not ANR's verified complaint for declaratory relief presents an affirmative claim under OCSLA. Why? Because plaintiff argues that under the case law a federal court lacks removal jurisdiction over a state declaratory judgment action where no allegation is made in the complaint that the declaratory defendant (CONOCO) intends or threatens to pursue a federal cause of action against it. *See e.g., Trent Realty Associates v. First Federal Savings and Loan,* 657 F.2d 29 (1981). Plaintiff argues further that since ANR's complaint does not allege that CONOCO threatens to bring an action under OCSLA, it is therefore unnecessary for the court to even look at the issue of whether ANR's verified complaint presents an *affirmative claim* under OCSLA. While the court finds plaintiff's arguments and the supporting case law persuasive on the proper interpretation of what is required under the "well-pleaded complaint" rule, under the facts of this case, the Court disagrees with the conclusion that there is no reason

to reach the issue of whether or not the complaint for declaratory judgment presents an affirmative claim under OCS-LA.

In the present case defendant argues that while it is true that plaintiff may have sought a declaratory judgment action in state court, the face of plaintiff's complaint makes clear that plaintiff sought to establish a defense to a breach of contract action which plaintiff anticipates that defendant will bring and that the anticipated breach of contract action is an action which *necessarily involves a federal question.* Thus defendant suggests that I must find that this Court has jurisdiction whether I look at the face of the complaint, or whether I look at CONOCO's "threatened action." Why is that? Because under defendant's theory, OCSLA intended to preempt any type of contract action—including this one for the sale of natural gas—which directly or *indirectly* concerns activities on the outer shelf. And what difference does that make? Obviously, that would mean that in the present case even though plaintiff's declaratory judgment action may have been properly *brought* in state court, since it seeks to establish a defense to an anticipated cause of action which necessarily involves a federal question, it is proper for defendant to remove pursuant to 28 U.S.C. § 1441(a).

■ There is no doubt that Section 1349(b)(1) confers original jurisdiction on the district courts of the United States. And, it is equally beyond argument that where district courts have original jurisdiction, such cases when first filed in state court may be removed by defendants to the district court pursuant to the removal statute 28 U.S.C. § 1441(a). Still, the precise issue presently before me is whether plaintiff's complaint standing alone, states a declaratory judgment relief to a threatened cause of action which necessarily must arise under OCSLA. Moreover, the burden of establishing the right to invoke federal jurisdiction is on the removing defendant. *Pullman Co. v. Jenkins,* 305 U.S. 534, 540, 59 S.Ct. 347, 350, 83 L.Ed. 344 (1939); *B.,*

*Inc., v. Miller Brewing Co.,* 663 F.2d 545 (5th Cir.1981). Out of deference to the principles of federalism, the removal statutes are strictly construed against removal. *Shamrock Oil Corp. v. Sheets,* 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). Generally, where there is doubt as to whether or not a federal court has removal jurisdiction, that doubt is to be resolved in favor of remand. *Butler v. Polk,* 592 F.2d 1293 (5th Cir.1979); *Elf Aquitaine, Inc. v. Placid Oil Co.,* 624 F.Supp. 994, 999 (D.Del.1985).

■ Essentially defendant must prove that the complaint states an OCSLA cause of action in one of two ways. Either the *unambiguous language* of the complaint establishes that plaintiff's declaratory judgment relief involves relief from a threatened breach of contract action which must *necessarily* be brought under OCS-LA; *or* in the alternative, that although plaintiff does not use language that unambiguously indicates that the declaratory relief claim involves relief from a threatened OCSLA action, such threatened "future" breach of contract action of the defendant *must* be brought under OCSLA because in effect OCSLA has preempted this type of contract action. Put differently, defendant is arguing that plaintiff cannot avoid removal jurisdiction simply by being an "artful dodger", that is, defendant suggests that plaintiff has sought to avoid removal jurisdiction by drafting a claim for declaratory judgment which *necessarily* arises under the provisions of the OCSLA as a claim for declaratory judgment and which only *apparently* arises under the principles of state law applicable to contract interpretation. (On the question of "devious pleading" *see e.g. Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981); *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). I disagree with defendant's conclusion, but for analytical reasons I will present the argument as defendant has framed it.

Defendant begins by setting forth the pertinent language of Section 1349(b)(1). That section indicates that:

Except as provided in subsection (c) of this section, the district courts of the United States shall have jurisdiction of cases and *controversies arising out of, or in connection with (A) any operation conducted on the Outer Continental Shelf* which involves exploration, development, or production of the minerals, of the subsoil and seabed of the Outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter (Defendant's emphasis).

Defendant asserts that the broad language of Section 1349 was intended by Congress to confer the "widest possible jurisdiction on federal courts to address *any* legal controversy related to the Outer Continental Shelf (the "OCS"), including contract disputes." (defendant's emphasis) See Defendant's Brief in Opposition to Remand at 4.

Defendant then turns to the language of the complaint to show this Court what plaintiff has alleged. Plaintiff's complaint asserts in paragraph four that *"[a]n actual controversy exists between ANRPL and CONOCO regarding the interpretation of certain provisions of 7 offshore contracts"* .... In Paragraph 7, plaintiff notes that the contracts in issue involve "wells located in Oklahoma, Texas, and *offshore* Louisiana." Finally, defendant indicates where plaintiff has outlined the terms of its *"Offshore Contracts"* in paragraphs 8 and 9 and where plaintiff finally pleads in paragraph 11 that *"force majeure* and other causes have affected and will continue to affect plaintiff's ability to take gas under the Contracts." See Defendant's Brief at 7.

Defendant then concludes that these recitations in plaintiff's well-pleaded complaint demonstrated that the complaint "indisputedly involve[s] a dispute over contracts involving offshore production on the Outer Continental Shelf near Louisiana." Defendant draws support for its conclusion from the express language of Section 1349(b)(1) and from case law which has interpreted that section. Defendant relies primarily on the holdings of three cases: *Laredo Offshore Constructors, Inc. v. Hunt Oil Company,* 754 F.2d 1223 (5th Cir.1985); *Fluor Ocean Services, Inc. v. The Rucker Company, Inc.,* 341 F.Supp. 757 (E.D.La.1972); and *Superior Oil Co. v. Transco Energy Co.,* 616 F.Supp. 98 (W.D. La.1985).

But the language of the complaint to which defendant has drawn my attention does not mention Section 1349(b)(1) or any other Section of OCSLA, nor does it imply that plaintiff anticipated a future action by CONOCO under OCSLA. Therefore, I must conclude that the unambiguous language of the complaint does not indicate that this contract dispute action is one which was brought under OCSLA.

But our inquiry doesn't end here because defendant is in effect saying "Sure, plaintiff has not mentioned OCSLA by *name,* for the simple reason that it is seeking to avoid the removal jurisdiction of the federal court." Defendant argues further that the case law indicates that plaintiff *had* to allege—either implicitly or explicitly—a future contract action arising under OCSLA on the part of CONOCO because a future breach of contract action as well as any prior corresponding declaratory judgment action seeking relief from that threatened action under the facts of this case necessarily involves an action under OCSLA. I am unpersuaded by defendant's argument and believe under the facts of this case as alleged in plaintiff's complaint, both logic and the weight of authority leads to the opposite conclusion.

First, does the case law that has interpreted contract disputes which allegedly arise under OCSLA really support defendant's contention that any contract which is connected in *any* way with the "exploration, development, or production of the minerals" of the Outer Continental Shelf must be brought under OCSLA? More specifically, does every contract for the sale

and/or resale of natural gas produced on the OCS arise out of and is it necessarily connected with "the exploration, development or production of the minerals" of the Outer Continental Shelf within the meaning of Section 1349?

I believe that a careful reading of the express language of Section 1349(b)(1) as well as an examination of the cases and controversies with which that Act is concerned indicates that the Act is relevant only to those direct and indirect controversies surrounding *the direct exploration, development or production* of minerals of the subsoil and seabed of the OCS.

In a market economy every contract for the production of goods and services is affected by—indeed its very lifeblood flows from—consumer demand. Where there is no demand, presumably there would be no actual or potential production in the first instance. But this connotation of production when applied in this context ("the production" of minerals in subsoil and seabed of the OCS) proves too much. I do not believe that Congress intended that every offshore contract for the *sale* and/or resale of natural gas be looked at as a contract which involves the exploration, development or production of minerals of the subsoil and seabed of the OCS. Under that interpretation, federal court jurisdiction would extend to any contract that even remotely relates to the selling or reselling of natural gas that comes from offshore wells. Moreover, I find the holdings of *Laredo* and *Fluor* to be based on a more narrow reading of § 1349(b)(1). I agree with plaintiff's argument that the contract issues in both of those cases were directly related to a *production* operation.

Defendant cites *Laredo* for the broad proposition that any and every contract dispute falls within the range of legal controversies Congress expected and intended to be submitted to the federal court. What defendant does not emphasize is that the contract dispute at issue in *Laredo* concerned the improper partial construction of a fixed offshore platform. That contract clearly relates to an offshore production

operation within the meaning of production intended by § 1349. The precise holding in *Laredo* was actually quite a narrow one. *Laredo* only held that original jurisdiction extended to contract disputes over platform construction. *See Laredo* at 1227. The *Laredo* court in fact noted that "the subject matter of the [present] action relates to the production of subsurface resources and in fact involves a necessary step in the *extraction process.*" *Id.* 1227, n. 4. (emphasis added)

The *Laredo* holding is important because it is supported by a thoughtful and comprehensive discussion of both the plain meaning and congressional intent behind OCSLA. The discussion includes the legislative history surrounding the original enactment of OCSLA in 1953 as well as the conference committee reports on the 1978 amendments. *Laredo* observes that the Supreme Court in *Rodriguez v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969) did an exhaustive review of the legislative history of OCSLA and concluded that "the purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the *fixed structures* ... on the Outer Continental Shelf." *Laredo,* at 1228, *quoting Rodriguez* at 355, 89 S.Ct. at 1837 (emphasis added).

The court notes as an aside that plaintiff's argument that the Supreme Court in *Gulf Offshore Company Company v. Mobil OCSLA* establishes that OCSLA does not confer "exclusive" federal jurisdiction in that OCSLA is not "inimical to state court jurisdiction" is incorrect. 453 U.S. 473 at 481, 101 S.Ct. 2870, at 2876, 69 L.Ed.2d 784. *Mobil* concerned a personal injury case which stemmed from events occurring on the shelf. The case was brought in state court. The majority specifically pointed out that "[I]t should be emphasized that this case only involves state court jurisdiction over actions based on incorporated state law. We express no opinions on whether state courts enjoy concurrent jurisdiction over actions based on the substantive provisions." *Mobil* at 479,

n. 7, 101 S.Ct. at 2876, n. 7. Thus *Mobil* is not authority for concurrent state court jurisdiction under a true § 1349(b)(1) case. That is not to say that such authority might not exist, it is just that *Mobil* does not foreclose that issue.

It follows, then, that if this were a true § 1349(b)(1) case, removal might still be possible because of the basic presumption that state courts enjoy concurrent jurisdiction over any particular federal claim where Congress has not expressly provided that such jurisdiction does not exist.

On the other hand, if a true § 1349(b)(1) case were the type of case over which the federal courts were granted *exclusive* jurisdiction, state courts could not exercise concurrent jurisdiction. Consequently, if such a case were removed to federal district court, the proper procedure following removal would be for the district court to dismiss the case without reaching the merits. *See Franchise Tax Board,* 463 U.S. at 24, n. 27, 103 S.Ct. at 2854, n. 27. Of course it is unnecessary to pursue this issue further since I do not believe that this case is one which arises under § 1349 or any other provision of OCSLA.

The House Committee on the Outer Continental Shelf described the general purpose of the 1978 amendments as one of "establish[ing] policies and procedures for managing Outer Continental Shelf oil and natural gas resources so as to better achieve national economic and energy policy goals". (citation omitted) *Laredo,* at 1227, n. 6. To suggest that this broad language implies that the purpose of the amendments was to include the establishment of policies and procedures which relate to the performance of private demand contracts which turn on consumer consumption simply because such consumer demand ultimately affects production would seem to me to imply that Congress intended to pass beyond mere regulation and introduce instead a planned economy directive—a directive uncharacteristic of a popularly elected congressional body and inconsistent with the basic philosophy of a free-market economy as well.

In clarifying the more narrow application of the amendments, the conference committee in fact noted that "[F]ederal law is to be applicable to all activities on all devices *in contact with the seabed for exploration, development, and production."* Conf.Rep. No. 1474, 95th Cong., 2d Sess. 80, *reprinted* in 1978 U.S.Cong. & Ad. News 1450, 1679 (emphasis added). Again, production must be read in the context of its two counterparts: exploration and development; not with its complement *sales* and *consumption.* I believe that a contract for the sale of offshore natural gas—standing alone—is too attenuated a contact with the seabed to bring a breach of private contract suit such as this one within the ambit of § 1349.

The issue in *Fluor* like that in *Laredo* concerned a contract dispute which arose when a drilling platform went down in a hurricane. In *Pogo Producing Company v. Southern Natural Gas Company,* 599 F.Supp. 720 (D.C.W.D.La.1984), the court distinguished the facts of *Fluor* from the contractual obligation of a leasee to "take or pay" for gas captured by a producer on the Outer Continental Shelf.

The court noted:

Defendant has also suggested that this court has jurisdiction pursuant to the [OCSLA] since the mineral operation by Pogo emanates from an offshore lease granted by an agency of the United States. If the present controversy arises out of or in connection with any operation conducted on the Outer Continental Shelf, then OSCLA would confer jurisdiction on this Court. See 43 U.S.C. § 1349(b). Such a situation was present in the case of *Fluor Ocean Services, Inc. v. Rucker Co.,* 341 F.Supp. 757 (E.D.La. 1972). There, the United States granted a mineral lease to Shell Oil Co. on the Outer Continental Shelf. The lease required the lessee to remove equipment and material note needed for producing wells upon expiration of the lease. From that obligation, the *Fluor* controversy arose. *In the Pogo matter, however, the leases in the Outer Continental Shelf*

*are not the source of the controversy. The issue which is in controversy is the responsibility of Southern to Pogo to purchase or pay for the gas captured by Pogo. The dispute between Pogo and Southern does not arise on the Continental Shelf. The dispute arises as a result of a private contract between a mineral lessee and a production purchaser.*

599 F.Supp. at 721. *Pogo* was—like the present case—a removal case. But more importantly, it spoke directly to the issue now before me: whether a contract dispute concerning the responsibility of one party "to take or pay for" natural gas produced by the other party arises out of or in connection with any operation conducted on the Outer Continental Shelf within the meaning of 43 U.S.C. § 1349(b) so as to confer jurisdiction on this court. I agree with the court in *Pogo* that there is no federal court jurisdiction in this instance.

I admit that *Superior Oil* does contain language which indicates that at least one judge would extend jurisdiction under Section 1349(b)(1) to include the present case. The *Superior Oil* court noted that "[t]his court has little difficulty in concluding that a contract for the sale of natural gas produced on the OCS arises out of and is connected with the 'exploration, development, or production of the minerals' of the Outer Continental Shelf. Hence this Court has original jurisdiction over the four OCS contracts [sic] at issue in this matter." *Id.* at 101.

As I have previously noted I *do* have difficulty in arriving at such a conclusion. Further, I believe that there are a number of factors which make *Superior Oil* distinguishable from this case. First, not only did the plaintiff in *Superior Oil* affirmatively plead the OCSLA provisions, but the jurisdiction issue apparently went uncontested as well. Second, there were other sources of federal question jurisdiction in *Superior Oil* including alleged violations of the Natural Gas Policy Act and the Sherman Anti-Trust Act. Therefore, the court's remark was, at best, dictum. More

importantly, I find the truncated and conclusory discussion of jurisdiction under § 1391 unconvincing and inappropriate in light of the legislative history and policy analysis previously discussed. Given OCS-LA's 33 year history during which courts have labored to analyze carefully the precise factual context prior to finding that a private contract dispute actually arose under the language of OCSLA—even where the contracts and activities analyzed were closely related to the direct exploration and extraction of minerals from the seabed— the ease with which the court in *Superior Oil* came to its far-reaching conclusion that offshore contracts to pay for natural gas are also included within the province of OCSLA, is difficult for me to really understand. It is not *Pogo* but *Superior Oil* that I find out of step with precedent.

Defendant argues in a footnote that I should ignore *Pogo* because it has been implicitly overruled by *Fluor, Laredo, Superior* and *Transcontinental.* While I flatly disagree that *Laredo* and *Superior Oil* overrule *Pogo* and have spent some time distinguishing them, I would like to drop my own footnote and add that it is hard to see how *Fluor* or *Transcontinental* could be said in any way to implicitly overrule *Pogo* since those cases were decided before *Pogo.* (*Fluor* was decided some twelve years before *Pogo.*) Perhaps defendant meant to say that *Pogo* was presciently overruled by *Fluor* and *Transcontinental.* But to my knowledge the powers of even our most capable jurists have never included precognition.

## II. *Jurisdiction Based on Substantial Questions of Federal Law*

■ I find defendant's substantial federal question argument less substantive than the first argument. Accordingly, I will analyze it in far less detail. Essentially, it is the very same argument which I found unpersuasive at the TRO hearing.

Defendant relies on *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) and *Oliver v. Trunkline*

*Gas Co.,* 796 F.2d 86, 88 (5th Cir.1986) to establish the proposition that there may be federal jurisdiction over a state-created claim when "some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims."

Defendant asserts that it is impossible for this court to decide the issue of whether events have occurred which constitute *force majeure* under the offshore and onshore contracts without first reaching several important, substantial questions of federal law. Defendant argues that this court would have to decide the *impact* of orders of a federal agency as well as the *impact* of several federal court decisions. (my emphasis).

Finally, defendant argues that *First Federal Savings & Loan Ass'n of Lake Worth v. Brown,* 707 F.2d 1217 (11th Cir.1983) (per curiam) established the proposition that "[w]here the rights which [a] plaintiff asserts [in a state court declaratory judgment action] would be supported if a federal statute or regulation is given one construction and defeated if given another, federal question jurisdiction exists." Defendant's Brief at 12. Defendant concludes that in the present case "[p]laintiff's right to relief hinges in part on whether the [federal] court decision "is given one construction as opposed to another." Defendant's Brief at 12.

Defendant's reliance on *Brown and Franchise Tax Board* is misplaced. To begin with, it is clear that plaintiff is alleging that it is the cumulative *impact* of federal regulations and court decisions, along with various state regulations and the international oversupply of gas that have resulted in its seeking a declaratory judgment that these events constitute *force majeure.* It is the impact of the regulations and other contingencies, not the meaning of the regulations that matters here. Nothing turns on construing a Federal Energy Regulatory Commission (FERC) guideline one way or the other. There is simply no disputed question of federal law at stake. All parties could

agree on the meaning of the regulatory guidelines, and a court could conclude that the *force majeure* clause ought to be invoked. The court could also go the other way and find that the clause ought not be invoked. That judgment call does not turn on an interpretation of federal law.

Similarly, a court could find that the FERC guidelines had little or no effect on the disputed contract provision and conclude that the *force majeure* clause should be invoked nevertheless. Or under the same factual finding it could conclude that the clause should not be invoked. Or a court could conclude that the FERC guidelines had a substantial impact on the contract and the court would still be free to either invoke the clause or not. To proceed through the possible permutations would be more tedious than difficult. The point is simply that this is *not* the type of disputed federal question problem meant to be processed within the analytical framework established by *Franchise Tax Board and Brown.* The outcome of finding that the *force majeure* clause ought to be invoked simply does not involve the interpretation of some substantial disputed question of federal law within the scope and meaning of *Franchise Tax Board and Brown.*

### Conclusion

At this point it seems appropriate to summarize the practical effects of applying the well-pleaded complaint rule and *Wycoff* dictum to the facts of this case. Plaintiff ANR sought a declaratory judgment in state court to ward off some future action which it feared defendant CONOCO would bring. Plaintiff sought a declaratory judgment that the cumulative impact of certain events constituted *force majeure* so that it, ANR, would be relieved of its contractual obligations. It is clear that the "threatened" action against which plaintiffs sought to establish a defense was not a federal cause of action but a simple breach of contract action. (In other words plaintiffs were seeking from a state court an interpretation of a clause of their private contract to "take or pay" for natural gas in

order to establish a defense to a threatened breach of contract suit which could be brought only in state court.)

It is admitted that this contract defense may involve a discussion of events that have occurred in the federal and even the international arena.[1] But under the facts of this case that is not enough for me to say that this cause of action therefore involves substantial federal questions—or "international questions" for that matter—which are somehow determinative of this Court's jurisdiction. Even if one assumes that the impact of the FERC guidelines go to the declaratory plaintiff's ANR's de-

fense to the declaratory defendant's (CONOCO's) breach of contract action, even preemption defenses under the well-pleaded complaint rule do not establish that plaintiff's claim arises under federal law so as to confer federal jurisdiction.

I believe that a contract dispute arising out of the immediate *transporting* of offshore natural gas presents a much closer question. For example, a dispute which might arise as a result of a structural defect in the pipeline attached to or near the seabed, or a leak at the well-head, may well fall within § 1349(b)(1). But I believe

---

[1] At the hearing, defendant produced additional documents from the United States Department of the Interior. These documents were purportedly produced to show the "strong interest" that the U.S. Government has in offshore leasing agreements. One of the documents contained a ruling by an administrative law judge which established that the U.S. Government (as lessor) as early as 1975 has been involved in a number of disputes with various oil and gas companies (as lessees) for royalty payments that were allegedly due on outstanding oil and gas leases. The administrative law judge made reference to royalty obligations that the lessee owed to the U.S. Government concerning take or pay payments made to a lessee—seller (e.g., CONOCO) by a buyer (e.g., ANR) which may have occurred following discovery of natural gas but prior to actual production. The thrust of the decision was that the *lessee* is obligated to make royalty payments on quantities of gas that are paid for even if they are not taken. (It is interesting that the United States Geological Survey's position was that "the minimum royalty provision of OCS leases serve as an incentive to encourage lessees to initiate leasehold production and sales as soon as practicable following the discovery of oil and/or gas." *Gulf Oil Corp., et al.,* 21 I.B. L.A. 1, 10 (1975)). The Survey's position implies that regulation of the gas and oil industry *via* royalty provisions was intended not only to produce revenue for the government, but also to stimulate production and encourage private initiative in selling gas on the open market. The Survey's analysis is enlightening and demonstrates the difference between the exploration, development, and production of natural resources and the subsequent sale and resale of those resources on the open market.

I do not believe that Congress ever intended to foster a policy of locking in "forced sales" to private transporters, sellers, and resellers of natural gas so as to generate royalty payments especially where those transporters and sellers because of government de-regulation concerning "take or pay" provisions on the consumer

end, later face a radically different market than that which existed when they entered into a sales contract with a lessee of natural gas. Nor does it appear that under OCSLA Congress intended that all contract disputes which directly or indirectly concern the sale of offshore natural gas be heard exclusively or concurrently in federal courts. That events in the federal regulatory arena may make-up part of a *force majeure* defense to a gas sales contract, or that the *effect* of federal regulations or even the likelihood that a federal question may emerge sometime during the course of an offshore gas sales contract dispute does not make the contract action one "arising under" federal law.

Further, it is clear that the ALJ ruling discussed above concerns disputes between the U.S. Government (lessor) and oil companies (lessees). Such disputes directly concern leases which were issued under authority of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. (1970). But these disputes are clearly different from the contract disputes that arise between the lessee (CONOCO) and the buyer (ANR Pipeline). The fact that CONOCO's royalty obligations to the U.S. Government may be effected when a buyer of natural gas who invokes the *force majeure* clause in one of its sales contracts does not for that reason make the offshore gas sales contract dispute also arise under OCSLA.

Of course under its *lease agreement* with the United States CONOCO *could* seek a declaratory judgment in a federal court so as to establish a defense to a "threatened" action brought by the U.S. Government against CONOCO for failure to live up to its obligations. But under the well-pleaded complaint rule, the possibility of the declaratory defendant (CONOCO) bringing an unrelated affirmative action under OCSLA against the *lessor* in the future does not thereby confer federal jurisdiction in a present breach of contract action for the sale of natural gas brought by a lessee (CONOCO) against a buyer (ANR). It is simply unrelated to the issue of federal question jurisdiction in the present suit.

this type of dispute represents the outer-limits of the kinds of controversies which Congress intended to include within OCS-LA when in 1978 it passed a series of amendments for the purpose of preserving, protecting, and developing the natural resources on the OCS. The real source of the present action—the well from which its lifeblood is drawn—is *state* law. I believe that these onshore and offshore "take or pay" contracts for the purchase of natural gas which is produced on the Outer Continental Shelf fall outside the ambit of the Outer Continental Shelf Lands Act. This case does not in my opinion "arise under" federal law within the meaning of the jurisdictional statute. 28 U.S.C. § 1331.

For these reasons I find that this case was improvidently removed. Accordingly, I am granting plaintiff's motion to remand and will issue an order remanding this case to the Mecosta County Circuit Court.